NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| GARRY R. FALOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| – vs. – | ) |
| | ) |
| G&S BILLBOARD, CONMACO/RECTOR | ) |
| L.P., CONMACO, INC., HERCULES | ) |
| MACHINERY CORPORATION, | )   Hon. Harold A. Ackerman |
| HMC NORTHEAST, INC., J&M | ) |
| HYDRAULICS, INC. D/B/A HMC | )   Civil Action No. 04-2373 (HAA) |
| NORTHEAST, INC., AMERICAN | ) |
| PILEDRIVING EQUIPMENT, INC. IN ITS | )   **OPINION AND ORDER** |
| OWN RIGHT AND AS SUCCESSOR IN | ) |
| INTEREST TO J&M HYDRAULICS, INC., | ) |
| BRUCO INDUSTRIES, INC., QUIKCUT, | ) |
| INC., IN ITS OWN RIGHT AND AS | ) |
| SUCCESSOR IN INTEREST TO BRUCO | ) |
| INDUSTRIES, INC., JOHN DOE #6, JOHN | ) |
| DOE #7, and JOHN DOE #8, | ) |
| | ) |
| Defendants. | ) |

_____)

Paul T. Hoffman, Esq.
HOFMANN & ASSOCIATES
17 Academy Street
Suite 415
Newark, NJ 07102
*Attorneys for Plaintiff*

Michael J. Marone, Esq.
MCELROY, DEUTSCH, MULVANEY & CARPENTER
1300 Mount Kemble Ave.
P.O. Box 2075
Morristown, NJ 07962-2075
*Attorneys for Defendant G&S Billboard*

Gerald David Siegel, Esq.
SIEGEL & SIEGEL, P.C.
666 Plainsboro Road
Building 100
Suite 1F
Plainsboro, NJ 08536
*Attorneys for Defendant Hercules Machinery Corp.*

Christopher E. Martin, Esq.
MORRISON MAHONEY LLP
Waterview Plaza
2001 U.S. HIGHWAY 46 EAST
Suite 200
Parsippany, NJ 07054
*Attorneys for Defendant American Piledriving Equipment, Inc.*

Brian R. Ade, Esq.
RIVKIN RADLER LLP
47 Maple Street - Third Floor
Summit, NJ 07901
*Attorneys for Defendant Bruco Industries, Inc.*


**ACKERMAN, Senior District Judge:**

This matter comes before the Court on three motions for summary judgment filed by

Third Party Defendants American Piledriving Equipment, Inc. ("American Piledriving"), Bruco

Industries, Inc. ("Bruco"), and Hercules Machinery Corporation ("Hercules"), collectively the

"Moving Defendants."  Defendant-Third Party Plaintiff G&S Billboard ("G&S") opposes all

three motions.  For the following reasons, American Piledriving's motion will be granted;

Bruco's motion will be denied; and Hercules's motion will not be ruled upon until it is properly

docketed as per this Court's express instructions and per the Local Civil Rules.

In addition, this Opinion addresses the Report and Recommendation ("R&R") of

Magistrate Judge Salas with respect to four other motions.  Specifically, Judge Salas's R&R

addressed Defendant QuikCut, Inc.'s motion for leave to file a late motion to dismiss; Plaintiff Falor's motions for default judgment against QuikCut and J&M Hydraulics, Inc.; and J&M's motion to set aside default. For the following reasons, the Court will adopt Judge Salas's R&R without change.

## I.   BACKGROUND

Plaintiff Garry R. Falor ("Falor") worked as a construction worker for J. Fletcher Creamer & Sons, Inc. ("Creamer"), a non-party. Defendant-Third Party Plaintiff G&S contracted with Creamer to erect a billboard adjacent to the New Jersey Turnpike. The erection of the billboard required pilings to be driven into the ground to support and stabilize the billboard. In performance of its contract, G&S drove reinforced steel bars, commonly referred to as rebars, into the ground to mark where the pilings would be placed. Pursuant to the contract, Creamer was responsible for driving the pilings into the ground. Support mechanisms called "leads" are used in the pile-driving operation to guide the piles into the ground. Essentially, leads are steel structures approximately three feet square and as much as thirty feet tall. They have an open lattice-type construction with a ladder down one side. Part of Falor's assignment was to climb up on the leads provided by Creamer. Hercules designed the leads, but Bruco manufactured them. Bruco asserts that it had no design experience with leads and manufactured them solely based upon the design specifications set forth by Hercules. After they were manufactured, Hercules sold the leads to Defendant J&M. It appears that J&M leased them to Falor's employer Creamer for use on the job site in the instant matter. Subsequent to the accident, American Piledriving purchased the assets of J&M.

On August 20, 2002, while jumping from a ladder attached to a section of the leads, Falor landed upon one of the place-marker rebars and sustained injuries.[1]  Falor filed the Original Complaint on May 21, 2004 naming G&S and John Does 1 and 2 and claiming negligence in maintaining the work site.  On July 16, 2004, Falor amended the Original Complaint to include Defendants Conmaco/Rector, L.P. ("Conmaco/Rector"), Conmaco, Inc. ("Conmaco"), and John Doe 3.  The First Amended Complaint asserted negligence against G&S, Conmaco/Rector, Conmaco, and John Does 1-3.  In addition, the First Amended Complaint contained a defective product claim against Conmaco/Rector and Conmaco.  At around the same time as the filing of the First Amended Complaint, Falor discovered that Conmaco/Rector and Conmaco had instituted a bankruptcy proceeding in the United States Bankruptcy Court for the Eastern District of Louisiana on February 27, 2004.  As a result, the suit was stayed pursuant to the automatic stay provisions of the Bankruptcy Code.  On January 12, 2005, Falor moved the bankruptcy court to lift the stay, which it did on May 19, 2005, and discovery in the case subsequently resumed.

While the motion to lift the stay was pending, Falor allegedly received a set of documents from Creamer which revealed Hercules's involvement.  Subsequently, on April 13, 2005, Falor filed the Second Amended Complaint identifying Hercules as one of the John Doe defendants listed in the First Amended Complaint.  The Second Amended Complaint asserted claims of negligence against G&S, Conmaco/Rector, Conmaco, Hercules, and John Does 2-4 and defective product claims against Conmaco/Rector, Conmaco, Hercules, and John Doe 4.  As discovery continued, Falor purportedly became aware of the involvement of Bruco and American Piledriving.  Consequently, Falor filed the Third Amended Complaint on October 12, 2005 to

---

[1] The half-inch diameter place-marker rebar impaled Falor through the rectum.

add Bruco, American Piledriving, and John Does 6-8 as defendants.  The Third Amended

Complaint contained defective product claims against all named Defendants with the exception

of G&S.  On October 31, 2005, this Court signed an Order of dismissal with respect to

Conmaco/Rector only.  On January 26, 2006, pursuant to the order of Magistrate Judge Falk,

Falor filed the Fourth Amended Complaint to clarify the products liability theories contained in

the previous complaints and to include a claim under the New Jersey Products Liability Act,

N.J.S.A. § 2A:58C-1 to 11.

       In March 2006, the Moving Defendants individually moved this Court to dismiss the

Fourth Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim, arguing that the statute of limitations on Falor's claims had run.  G&S

then filed opposition papers against the Moving Defendants' motion to dismiss the Fourth

Amended Complaint and also moved the Court for leave to file a third party complaint against all

named Defendants.

       In an Opinion and Order dated October 24, 2006, this Court addressed those motions and

found that "Falor did not meet the requirements of the fictitious party rule and that his claims

against the Moving Defendants [were] time-barred."  *Falor v. G&S Billboard*, No. 04-2373, slip.

op. at 9 (D.N.J. Oct. 24, 2006).  This Court further held that "Falor's Fourth Amended Complaint

[did] not relate back to the Original Complaint and the claims contained therein [were] time-

barred as against the Moving Defendants."  *Id*. at 11.  However, the Court also concluded that

G&S was entitled to file a third party complaint against the Moving Defendants (Bruco,

Hercules, and American Piledriving), but not Conmaco, HMC Northeast, J&M, or Quickcut

because those parties did not join in the motion to dismiss and therefore remained in the case as

original defendants and thus subject to cross-claims by G&S, rather than any third party claims. *See id*. at 13.

On November 8, 2006, G&S filed its three-count Third Party Complaint against American Piledriving, Bruco, and Hercules.  Count One alleges that the Moving Defendants are liable on a products liability theory under New Jersey statutory law.  Specifically, Count One alleges that the Moving Defendants designed, manufactured, sold, marketed and/or distributed a defective product, namely the leads from which Falor jumped before landing on the rebar installed by G&S.  Count Two is essentially an indemnification claim and Count Three is a contribution claim, both of which depend on G&S being found liable to Falor.

On December 22, 2006, American Piledriving filed one of the instant motions for summary judgment.  American Piledriving's primary argument is that it is a successor in interest to J&M, which placed the leads on the site, and therefore American Piledriving, as a matter of law, cannot be held liable on the products liability claim, and thus cannot be liable on the indemnification or contribution claims.  G&S's primary argument in response is that the motion was filed too close in time to the filing of the Third Party Complaint and so G&S needed discovery to determine whether American Piledriving qualified for any of the exceptions to the rule regarding successor in interest non-liability.  On January 11, 2008, this Court issued a Letter Order directing American Piledriving and G&S to file supplemental briefing on the issue of successor liability based upon any discovery obtained since the filing of the original motion.  The parties responded and this Court has considered those papers, as addressed below.

On December 3, 2007, Bruco filed one of the instant motions for summary judgment. Bruco's primary argument is that it did not design the leads in question and therefore it cannot be

6

liable on G&S's first claim regarding products liability.

On December 19, 2007, Hercules served its adversaries the third of the instant motions for summary judgment. It appears that Hercules also sent a copy to these Chambers, but Hercules failed to comply with Local Civil Rule 5.2(2), which requires that all documents be filed electronically with the Clerk's Office. On or about January 10, 2008, this Court contacted counsel for Hercules, Gerald D. Siegel, Esq., and notified him that the motion would not be considered until it was properly docketed with the Clerk's Office.[2] Counsel never filed the motion as directed, and therefore the Court does not address it in this Opinion.[3]

## II.   ANALYSIS

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987). Summary judgment may be granted only if the movant shows that "there exists no genuine issue of material fact that would permit a

---

[2] The Court observes that Mr. Siegel is aware of the electronic filing process and has electronically filed documents in this case, albeit occasionally incorrectly. *See, e.g.*, Doc. No. 53 (Clerk's note terminating Hercules's motion due to an improper electronic signature by Mr. Siegel).

[3] In its motion, Hercules's primary argument is that there is no evidence that it actually manufactured the leads in question because it is missing the typical insignia and serial number that would identify it as one manufactured by Bruco and therefore designed and sold by Hercules.

reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248; *see also Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).

The substantive law will identify which facts are "material." *Anderson*, 477 U.S. at 247-48. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.* A district court faced with a summary judgment motion must view all evidence and the inferences to be drawn therefrom in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994). It is inappropriate for a district court to resolve factual disputes or make credibility determinations at the summary judgment stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Indeed, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Id.*

This does not mean, however, that a district court may ignore the weight of the evidence. *Id.* "[I]f the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *Peterson v. Am. Tel. & Tel. Co.*, Civ. A. No. 99-4982, 2004 WL 190295, at *3 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249). Therefore, to raise a genuine

8

issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

### A.   <u>American Piledriving</u>

In its motion for summary judgment on G&S's third party Complaint, American Piledriving makes two primary arguments.  First, it contends that it cannot be held liable to G&S as a matter of law due to a lack of successor liability.  Second, it contends that New Jersey's Product Liability Act subsumes G&S's claims for breach of implied warranty, negligence, and strict liability.  The Court will address each argument in turn.

As previously explained, American Piledriving's involvement in this case is based upon its connection to the leads off which Falor jumped before landing on the rebar and injuring himself.  Again, American Piledriving did not design, manufacture, or sell the leads, but instead entered into an Asset Purchase Agreement regarding the assets of J&M, after Falor's accident. J&M did have direct involvement with the leads in question insofar as it appears to have been the entity that leased the leads to Falor's employer Creamer.

Falor's accident occurred on August 20, 2002.  On October 29, 2002, FirstMerit Bank filed a Complaint against J&M in the Western District of Pennsylvania seeking injunctive relief, an accounting, and the appointment of a receiver.  *See FirstMerit Bank, N.A. v. J & M Hydraulic*

*Sys., Inc.*, No. 02-1854.  That District Court granted a temporary restraining order, appointed a receiver for J&M's assets, and later enjoined J&M from disposing of its assets without the receiver's consent.  On December 4, 2002, the Receiver and a newly formed affiliate of American Piledriving executed an Asset Purchase Agreement whereby American Piledriving's new affiliate would purchase all of J&M's inventory located in Pittsburgh; the assets of the construction equipment sales, rental, and repair business with principal offices in Matawan, New Jersey; all of J&M's intellectual property; and all of J&M's interest as lessee in certain equipment leases.  On January 17, 2003, the District Court approved the Asset Purchase Agreement, after finding that it was negotiated at arm's length, and that the newly formed American Piledriving affiliate was not related to or controlled by the defendants in that case.  *See FirstMerit Bank, N.A. v. J & M Hydraulic Sys., Inc.*, No. 02-1854, Order at ¶¶ 6-7 (W.D. Pa. Jan. 17, 2003).  Thus, in the instant matter, G&S's theory of third party liability against American Piledriving is premised upon a successor in interest theory whereby G&S contends that American Piledriving is liable just as J&M is or would have been under a strict products liability theory.

"Generally, liability for injuries caused by defective products extends from the manufacturer down the chain of distribution to distributors and retailers." *Mettinger v. Globe Slicing Mach. Co., Inc.*, 153 N.J. 371, 379 (1998).  "Absent an agreement to the contrary, however, distributors and retailers are entitled to indemnification from the manufacturer." *Id*. at 380.  Under traditional rules, "if the manufacturer sells or transfers its assets to another company, the successor is not liable either to injured parties or to distributors and retailers." *Id*.  "Thus, . . . neither plaintiffs nor distributors and retailers may maintain an action against a successor

corporation unless they can establish one of [five] exceptions." *Id.*[4]

However, in *Ramirez v. Amsted Industries*, 86 N.J. 332 (1981), the Supreme Court of

New Jersey "abandoned the traditional approach in the products liability context and adopted the

'product-line exception' to successor corporation liability, holding:

> [W]here one corporation acquires all or substantially all the
> manufacturing assets of another corporation, even if exclusively for
> cash, and undertakes essentially the same manufacturing operation as
> the selling corporation, the purchasing corporation is strictly liable for
> injuries caused by defects in units of the same product line, even if
> previously manufactured and distributed by the selling corporation or
> its predecessor."

*Mettinger*, 153 N.J. at 380 (quoting *Ramirez*, 86 N.J. at 358).  In so holding, the *Ramirez* Court

"recognized three reasons for imposing potential liability on a successor corporation that acquires

the assets and continues the manufacturing operation of its predecessor:

> (1) The virtual destruction of the plaintiff's remedies against the
> original manufacturer caused by the successor's acquisition of the
> business, (2) the successor's ability to assume the original
> manufacturer's risk-spreading role, and (3) the fairness of requiring
> the successor to assume a responsibility for defective products that
> was a burden necessarily attached to the original manufacturer's good
> will being enjoyed by the successor in the continued operation of the
> business."

*Mettinger*, 153 N.J. at 381 (quoting *Ramirez*, 86 N.J. at 349).

In the instant matter, both G&S and American Piledriving place particular emphasis on

---

[4] The five exceptions under the traditional rules are: "(1) the purchaser expressly or
impliedly agreed to assume such debts or liabilities; (2) the transaction amounts to a
consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a
continuation of the selling corporation; or (4) the transaction is entered into fraudulently to
escape the debt or liability.  A fifth exception, sometimes incorporated in one of the preceding
exceptions, arises from the absence of adequate consideration for the sale or transfer."
*Mettinger*, 153 N.J. at 380 (internal citations omitted).

*Ramirez* for the resolution of this issue.  Indeed, this Court acknowledged as much when it issued the January 11, 2007 Letter Order directing the parties to provide supplemental briefing on the issue of whether American Piledriving can be held liable as a successor in interest to J&M Hydraulics.

An important distinction, however, must be made between this case and *Ramirez*, and its progeny: American Piledriving is a distributor, just as J&M was a distributor, and neither is the manufacturer of the leads in question.  This Court has not located, and the parties have not identified, any case applying the product-line exception announced in *Ramirez* to a situation such as this where a third party plaintiff (or any plaintiff) argued, much less won the argument, that a defendant *distributor* was liable as a successor-in-interest to a predecessor *distributor* for strict products liability where the *manufacturer* is a viable defendant in the case at bar.  Indeed, such application appears antithetical to the very reasons announced in *Ramirez* for the judicially created product-line exception.

For example, there is no "virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business" because the original manufacturer here, Bruco, still exists and is a named and active Defendant in this case.  *See Ramirez*, 86 N.J. at 349.  As for the "successor's ability to assume the original manufacturer's risk-spreading role," there is nothing to suggest that American Piledriving is in any better position than Bruco to spread the risk.  On the contrary, the Supreme Court of New Jersey has observed that "manufacturers are better positioned to avoid and allocate risk than distributors." *Mettinger*, 153 N.J. at 383.  With regard to the third reason in *Ramirez*, the "fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily

12

attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business," American Piledriving has not enjoyed any such manufacturer's goodwill.  *Ramirez*, 86 N.J. at 349.

Arguably, the foregoing analysis misses the mark inasmuch as the proper analysis should examine whether American Piledriving received good will from J&M–rather than Bruco–such that American Piledriving should assume responsibility for the allegedly defective leads.  That, in essence, was the purpose behind this Court's January 11, 2008 Letter Order because G&S, in its original opposition brief, had not demonstrated why American Piledriving should be subject to the product-line exception to the general rule that "if the manufacturer [or distributor] sells or transfers its assets to another company, the successor is not liable . . . to injured parties." *Mettinger*, 153 N.J. at 380.  Remember, the product-line exception subjects a successor to liability "where one corporation acquires all or substantially all the . . . assets of another corporation, even if exclusively for cash, and undertakes essentially the same . . . operation as the selling corporation."  *Ramirez*, 86 N.J. at 358.

In essence, assuming that *Ramirez* is even applicable in this context to allow American Piledriving to be liable on a successor-in-interest theory, this Court can reformulate the *Ramirez* product-line exception to apply in this context if it can be shown that American Piledriving acquired all or substantially all of the assets of J&M and undertook essentially the same distribution as J&M.  In answering this question, it is useful to observe what the *Ramirez* Court found important on the same issue.

In that case, the successor corporation bought assets that "included the manufacturing plant . . ., which had been operated by [the predecessor]."  *Ramirez*, 86 N.J. at 338.  In addition,

the successor "acquired all of [the predecessor's] inventory, machinery and equipment, patents and trademarks, pending contracts, books and records, and the exclusive right to adopt and use the [predecessor's] trade name." *Id*. Furthermore, the predecessor "agreed to use its best efforts to make available to [the successor] the services of all of its present employees except its three principals, who covenanted not to compete with [the successor] for a period of five years." *Id*. Following the acquisition, the successor manufactured the product through its wholly-owned subsidiary in the original plant occupied by the predecessor prior to acquisition. *Id*. at 339.

In the instant matter, the Asset Purchase agreement, whereby American Piledriving purchased certain assets of J&M, contains several specifically delineated items and categories of items that were included in the purchase. Specifically, American Piledriving purchased "all of the parts inventory," "all of the finished goods inventory," "all of the work-in-progress inventory," and "all of the machines, tools, and raw materials" then stored at J&M's 38th Street location in Pittsburgh, Pennsylvania. (Asset Purchase Agreement at 1-2.) Similarly, American Piledriving purchased "certain machines, tools, and raw materials," as well as "all of the parts inventory" located at J&M's 51st Street location in Pittsburgh. (*Id*.) In addition, American Piledriving purchased all of J&M's "equipment rental fleet (wherever located)" and "all of the furniture, office equipment, repair equipment, tools and parts inventory located" at J&M's "Matawan ('Old Bridge'), New Jersey sales office and yard." (*Id*.) Furthermore, American Piledriving purchased "all of the accounts receivable" and, importantly, "all of the designs, drawings, patterns, molds and other intellectual property . . . wherever located." (*Id*.)

Some assets were specifically excluded from the sale, including "all of the assets . . . located at [J&M's] Liberty Street Location [and] any office equipment, any shop or factory

14

equipment, tools, and or any vehicles . . . not specifically described [above]." (*Id*. at 3.)  There is nothing in the Asset Purchase Agreement, nor have the parties otherwise identified anything indicating, what proportion of J&M's overall assets were purchased by American Piledriving in this transaction.  As a result of this lack of information, this Court cannot conclude that American Piledriving purchased substantially all of J&M's assets, especially considering the fact that J&M still is in operation and is an active Defendant in this case.

Next, the Court must determine whether American Piledriving, subsequent to the purchase, "undert[ook] essentially the same . . . operation as" J&M prior to the sale.  *See Ramirez*, 86 N.J. at 358.  There is little in the record that answers this question, but it seems evident that J&M and American Piledriving were in the same line of work prior to the purchase and American Piledriving has continued that operation after the purchase.  Therefore, the Court finds that American Piledriving undertook essentially the same operation as J&M, but it is unclear whether J&M continued in its own right as a smaller business.

As for the three *Ramirez* reasons for imposing liability under the product-line exception, those reasons can be recast as factors to assess the instant matter: (1) Whether G&S's remedies against J&M have been destroyed by American Piledriving's acquisition of J&M's assets; (2) whether American Piledriving has the ability to assume J&M's risk-spreading role; and (3) whether fairness requires American Piledriving to assume a responsibility for the leads sold by J&M because of J&M's goodwill being enjoyed by American Piledriving in the continued operation of the business.

In *Leo v. Kerr-McGee Chemical Corp.*, the Third Circuit applied the *Ramirez* factors and held that "the destruction of the injured party's remedy is a *necessary* but not a *sufficient* basis on

which to place liability on the successor." 37 F.3d 96, 99 (3d Cir. 1994) (emphases in original). Here, G&S's remedies against J&M do not appear to have been destroyed by the American Piledriving purchase. Indeed, J&M is a named Defendant in this action, and, although Plaintiff Falor had moved for default, J&M has awoken from its slumber and appears ready to defend itself in this action going forward. Moreover, G&S has presented nothing to suggest that its remedies against J&M have been destroyed by American Piledriving's purchase.

As this Court previously noted, the application of the product-line exception here would be anomalous because the Supreme Court of New Jersey crafted the exception out of whole cloth in the context of manufacturers, not distributors. The instant matter also differs from *Ramirez* in the undisputed fact that both the manufacturer (Bruco) of the leads and the designer (Hercules) are named Defendants here. It is important to remember that the product-line exception is precisely that: an *exception* to the *rule* that a successor corporation is not liable for the acts of the predecessor corporation. The Court also observes that the product-line exception was fashioned to protect the person who suffered the tort because of the product, in this case Plaintiff Falor, but G&S is, quite simply, a corporate *defendant* seeking to receive the benefits of the exception against what were originally co-defendants, and now are third party defendants. It is not at all clear that the Supreme Court of New Jersey intended its *Ramirez* holding to apply to defendants seeking to shift liability to other defendants.

The Third Circuit in *Kerr-McGee*, in declining to apply the *Ramirez* product-line exception, based its decision in part on the explanation that in a diversity case "'federal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law . . . . Our role is to apply

16

the current law of the jurisdiction, and leave it undisturbed.'"  *Kerr-McGee*, 37 F.3d at 101

(quoting *City of Philadelphia v. Lead Indus. Ass'n*, 994 F.2d 112, 123 (3d Cir. 1993)).  Because

the current state of the law in New Jersey has not extended the judicially-created product-line

exception to apply to a successor distributor where the predecessor distributor, the product

manufacturer, and the product designer are all viable defendants, this Court will not engage in

any blind exploration of such uncharted territory, especially not at the request of a defendant

seeking to shift liability to another defendant.

　　　　This Court finds that the product-line exception does not apply to American Piledriving,

and therefore it cannot be held liable on a successor-in-interest theory.  Therefore, American

Piledriving's motion for summary judgment will be granted.  Accordingly, this Court need not

address the other *Ramirez* factors because the first factor–the destruction of the injured party's

remedy–is a necessary, but missing component.  *See Kerr-McGee*, 37 F.3d at 99.  Furthermore,

this Court need not address American Piledriving's argument that it is entitled to summary

judgment on the grounds that it is not a "seller" under the New Jersey Products Liability Act.

　　　　Finally, having dismissed the First Count relating to products liability, the Court must

address the remaining two Counts of G&S's three-count Third Party Complaint against

American Piledriving.  In the Second Count, G&S alleges that if G&S is liable to Plaintiff, then

"the incident and alleged damages were due and proximately caused by the negligence, breach of

contract, breach of express and/or implied warranties and/or covenants, wrongful conduct and/or

other fault on the part of" American Piledriving.  (Third Party Compl. ¶ 38.)  Also in the Second

Count, G&S alleges that if it is liable, then it is entitled to indemnification from American

Piledriving.  In the Third Count, G&S alleges, in the alternative, that it is entitled to contribution.

The New Jersey Products Liability Act (the "NJPLA") applies to "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty."  N.J.S.A. § 2A:58C-1(b)(3).  The Third Circuit has explained that the NJPLA is "'the sole basis of relief under New Jersey law available to consumers injured by a defective product.'" *Port Auth. of N.Y. & N.J. v. Arcadian Corp.*, 189 F.3d 305, 313 (3d Cir. 1999) (quoting *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir.1991)).  Accordingly, American Piledriving is entitled to summary judgment on the Second Count inasmuch as it alleges negligence and breach of implied warranties, both of which have been subsumed in the products liability Count dismissed above on the basis of a lack of successor-in-interest liability.  *See Green v. Gen. Motors Corp.*, 310 N.J. Super. 507, 517 (App. Div. 1998) ("[T]he causes of action for negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action, the essence of which is strict liability.")

Similarly, American Piledriving is entitled to summary judgment on G&S's claim for breach of contract and express warranties.  While not subsumed within the products liability Count, G&S has nevertheless failed to allege the existence of any contract, much less any express warranties, between G&S and J&M for which American Piledriving could even remotely be held liable.  Therefore, the Court will grant American Piledriving's motion for summary judgment on all of G&S's three Counts in its Third Party Complaint.

18

**B.**     **Bruco**

Third Party Defendant Bruco also filed a motion for summary judgment, in which Bruco

essentially contends that it is insulated from liability, despite being the manufacturer of the

allegedly defective product, because it relied on the design specifications provided to it by Third

Party Defendant Hercules.  Remember, Hercules designed the leads off which Plaintiff Falor

jumped and injured himself, but Bruco performed the actual manufacturing of the leads per

Hercules's specifications.  The dispute between Bruco and Third Party Plaintiff G&S here

centers on two dueling cases from the Supreme Court of New Jersey.  At its core, however, the

cases are readily distinguishable and pose no conflict.

In *Michalko v. Cooke Color & Chemical Corp.*, the Supreme Court of New Jersey

addressed a situation whereby the plaintiff was injured by her employer's machine.  91 N.J. 386,

391 (1982).  The plaintiff's employer designed the machine, but the defendant manufactured it.

The central question in that case was "whether an independent contractor that undertakes to

rebuild part of a machine in accordance with the specifications of the owner has a legal duty to

foreseeable users of the machine to make the machine safe or to warn of the dangers inherent in

its use."  *Id.* at 393.

The defendant argued that it could not be legally responsible for the plaintiff's injuries

resulting from any design defect because "it was hired to rebuild part of the [machine] to the

[employer's] specifications."  *Id.* at 395.  The *Michalko* Court noted the general principle that

"the fact that the product was built according to the plans and specifications of the owner does

not constitute a defense to a claim based on strict liability for the manufacture of a defective

product when the injuries are suffered by an innocent foreseeable user of the product."  *Id.*

19

Applying that principle, the Supreme Court of New Jersey rejected the defendant's argument and held that the "[d]efendant's lack of responsibility under its contract for the design of the machine is not relevant."  *Id.* at 395-96.  The *Michalko* Court further held that the manufacturer's "adherence to or reliance upon the [employer's] plans, even though required by its contract, is equally irrelevant," and then explained that "[i]t is not necessary to show that [the] defendant created the defect.  What is important is that the defect did in fact exist when the product was distributed by and was under the control of the defendant."  *Id.* at 396.

Based upon *Michalko*, it is quite clear that Bruco cannot evade liability in this case simply by proclaiming its faithfulness to Hercules's design specifications.  On the contrary, as the manufacturer of a product that allegedly contains a design defect, Bruco can be held strictly liable for injuries proximately caused by the design defect existing in the product at the time it left Bruco's control.  Arguably, it is unfair to hold the manufacturer liable where the designer has far greater expertise and insight into the engineering safety and efficacy of a particular design.  Unfortunately, it is not for this Court to challenge the wisdom of a rule that requires the laboring oar to second guess the judgment of a ship's captain.  That is the law on this issue and this Court shall endeavor to faithfully apply it.

To overcome the apparent conclusiveness of *Michalko*, Bruco heavily relies on a later decision by the Supreme Court of New Jersey in which the Court addressed "whether a fabricator, who produces a non-defective component part for an integrated manufacturing system in accordance with the designs and specifications of the owner, has a legal duty to ensure that the owner and installer-assembler properly integrate the component into the system."  *Zaza v. Marquess and Nell, Inc.*, 144 N.J. 34, 47 (1996).  In *Zaza*, the plaintiff was employed by

Maxwell House Coffee in that company's Hoboken plant when he was severely burned by "hot molten water and carbon" that overflowed from a tank he was seeking to repair.  *Id*. at 42.  The only defendant on appeal in *Zaza* was the company that fabricated the tank, but a different company designed that same tank, and both companies had been hired either directly or indirectly by Maxwell House.  As the *Zaza* Court noted, the tank was only one component in a "system so complex that even Maxwell House, a large company skilled for years in the making of coffee, did not have enough expertise to install and assemble the system.  Maxwell House found it necessary to hire . . . an outside company to assemble and integrate the trecar-carbon regeneration system."  *Id*. at 56.  The Court found this fact, coupled with the fact that the plaintiff "provided no evidence that the quench tank was in a defective condition when it was delivered to Maxwell House," to be critical to the Court's conclusion.

After noting that a "component part fabricator . . . may be held strictly liable for injury caused by a defective component where the defect is in the component part and the part did not undergo substantial change after leaving the manufacturer's hands," *id*. at 65 (citing *Michalko*, 91 N.J. at 399), the *Zaza* Court held that "a fabricator of a component part who builds a component of *a system* in accordance with the specifications of the owner, which part itself is *not defective* and is not dangerous until it is integrated into the *larger system*, has no legal duty to ensure that the owner and installer-assembler properly integrate the component into the system," *id*. (emphases added).  In so holding, the *Zaza* Court expressly distinguished the facts of *Michalko*, observing that *Michalko* involved a suit against a rebuilder of machinery rather than a mere maker of component parts.  *Zaza*, 144 N.J. at 50, 55 ("[T]he facts in the present case are very different from the facts in *Michalko*").

21

Bruco attempts to bring itself within the rubric of *Zaza* by asserting that it "is a component part manufacturer." (Bruco Reply Br. at 7.) To support this assertion, Bruco points to the deposition testimony of Mark Webb, the President of Bruco. Specifically, Bruco quotes a colloquy from the deposition, helpfully underscoring the parts it believes supports its position:

> Q.   You're familiar with . . . the fact that there are <u>different components</u> to a set of leads, right?
> A.   I don't understand what you mean by separate or different components.
> Q.   In other words, are you familiar with the fact that leads is [sic] actually comprised of <u>several different sections</u>?
> A.   That hook together?
> Q.   Correct.
> A.   Yes, I'm aware of that.
> Q.   You're aware that there's a top section, one or more mid sections and then a bottom section called a stab section?
> A.   I'm aware of that.

(Bruco Reply Br. at 8 (quoting Webb Dep. at 38:16 to 39:7 and 41:3-18) (emphases in original).) Of course, every time the ostensibly magic words are used in this colloquy, the *attorney* is saying them, which somewhat undercuts Bruco's argument. In addition, Bruco's argument appears to equate the component in *Zaza* with the fact that the leads in question in this case contains three to four sections that can be hooked together to lengthen the leads for use in the field. Indeed, Bruco declares that "just like the quench tank component part involved in *Zaza*, the leads sections in this matter, which are interchangeable and come in various lengths, are part of a larger pile-driving unit that is suspended from crane. As such, the leads are component parts." (Bruco Reply Br. at 9.) The Court disagrees inasmuch as Webb's testimony falls woefully short of demonstrating factual similarity to *Zaza*, where the component was part of a large complex trecar-carbon regeneration system. Contrary to Bruco's assertions, such a comparison flirts with

the ridiculous.  Using the magic word "component" where Bruco manufactured and assembled all the components is hardly the same thing as *Zaza*.

Ultimately, this Court finds the facts of this case more analogous to *Michalko*. Accordingly, the holding in that case dictates the outcome here insofar as Bruco cannot escape liability simply because it manufactured a product designed by another entity.  Furthermore, in *Michalko*, the defendant did not create a product, but instead disassembled one, modified and added parts, and then rebuilt it, but it still was not considered a finished product by the Supreme Court.  Here, Bruco was responsible for manufacturing the entire finished product from beginning to end, which suggests that if a defendant as in *Michalko* can be liable on a defective design claim, then a fabricator such as Bruco that constructs a finished product can also be held liable to foreseeable users of the product.

Finally, Bruco also argues that it cannot be liable because "NONE of the expert reports ascribe ANY liability to Bruco with regard to the alleged defective design."  (Bruco Br. at 5 (emphases in original).)  Bruco's argument misses the mark inasmuch as G&S's expert has identified a defect in the design of the leads.  Once it has been determined that the product is defective, all parties in the chain of distribution are held strictly liable.  *Mettinger*, 153 N.J. at 379 ("Generally, liability for injuries caused by defective products extends from the manufacturer down the chain of distribution to distributors and retailers.").  Contrary to Bruco's implicit argument, the expert's report need not mention every link in the chain of distribution for a party to be held strictly liable.  Accordingly, the Court will deny Bruco's motion for summary judgment.

### III.    REPORT & RECOMMENDATION

As previously noted, this Court referred several motions to Magistrate Judge Salas. Specifically, Magistrate Judge Salas addressed Defendant QuikCut's motion for leave to file a late motion to dismiss (Doc. No. 95); Plaintiff Falor's motions for entry of default judgment against QuikCut (Doc. No. 99) and J&M (Doc. No. 93); and J&M's motion to set aside default (Doc. No. 106).  On May 7, 2007, Judge Salas filed her Report and Recommendation ("R&R"), which recommended granting QuikCut's motion, denying Falor's motion for default against QuikCut, reserving decision on Falor's motion for default against J&M, and denying J&M's motion to set aside default.

Soon thereafter, however, J&M requested that Judge Salas allow it to file additional affidavits to cure the evidentiary deficiencies that prompted Judge Salas to reserve decision on the default issue.  Subsequently, on February 4, 2008, Judge Salas issued another R&R that affirmed her prior R&R, except that she changed the original recommendation to reserve decision as to J&M to a recommendation to grant J&M's motion to set aside default.

Local Civil Rule 72.1(c)(2) provides that any party may object to a Magistrate Judge's R&R by filing such objections within 10 days after being served with a copy of the R&R. Federal Rule of Civil Procedure 6(a) provides that "[w]hen the period of time prescribed or allowed is less than 11 days," weekends and legal holidays shall not be included in the computation of the deadline for objections to be filed.  There were two legal holidays, in addition to the interceding weekends, after February 4, 2008, that expanded the 10 day deadline.  For filing purposes, Rule 6(a) also excludes "a day on which weather or other conditions have made the office of the clerk of the district court inaccessible."  The Clerk's Office was closed due to

24

inclement weather on February 22, 2008, and therefore Rule 6(e) adds an additional day to the 10

day deadline.  In addition, Rule 6(e) provides that the parties shall receive an additional 3 days if

they are served by electronic means.   The parties were served the R&R electronically, therefore

Rule 6(e) enlarges the time for response.  Reading all rules together, the parties were required to

file any objections to Judge Salas's R&R by Tuesday, February 26, 2008.  The parties did not

timely file any objections to the R&R.

A court must make a *de novo* determination of those portions of the R&R to which

objection is made and "may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the Magistrate Judge."  L. Civ. R. 72.1(c)(2); *see also* 28 U.S.C. §

636(b)(1)(C); Fed. R. Civ. P. 72(b).  While this Court need not review a Magistrate Judge's

report before adopting it when no objections have been filed, *Thomas v. Arn*, 474 U.S. 140, 149

(1985), the Third Circuit has held that "the better practice is to afford some level of review to

dispositive legal issues raised by the report," *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir.

1987).  "[I]t must be assumed that the normal practice of the district judge is to give some

reasoned consideration to the magistrate's report before adopting it as the decision of the court."

*Id.* at 878.

This Court has carefully reviewed Magistrate Judge Salas's R&R.  As to Falor's motion

for default against QuikCut, Magistrate Judge Salas found that QuikCut satisfied every factor,

including that it has a meritorious defense, that there is little prejudice to Falor in denying

default, and that QuikCut's culpability does not amount to "flagrant bad faith."  (May 7, 2007

R&R at 10-12 (quoting *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 75 (3d Cir. 1987).)

Magistrate Judge Salas made a similar finding with regard to J&M, and ultimately concluded that

25

Falor's motion for default should be denied and J&M's motion to set aside default should be granted. (*See* Feb. 4, 2008 R&R at 4-7.)  This Court agrees with the R&R on these issues.  In addition, both R&Rs recommend, without discussion, granting QuikCut's motion for leave to file a late motion to dismiss.  This Court has no reason to disagree with that finding.  Accordingly, this Court will adopt Magistrate Judge Salas's R&R without change.


### *Conclusion & Order*

For the foregoing reasons, it is hereby ORDERED that:

1. American Piledriving's motion for summary judgment (Doc. No. 90) as to all Counts of G&S's Third Party Complaint is GRANTED.

2. Bruco's motion for summary judgment (Doc. No. 131) as to all Counts of G&S's Third Party Complaint is DENIED.

3. Magistrate Judge Salas's February 4, 2008 Report and Recommendation is ADOPTED as to all four motions.  Therefore, QuikCut's motion for leave to file a late motion to dismiss (Doc. No. 95) is GRANTED; Falor's motions for entry of default judgment against QuikCut (Doc. No. 99) and J&M (Doc. No. 93) are DENIED; and J&M's motion to set aside default (Doc. No. 106) is GRANTED.

Dated: February 27, 2008
Newark, New Jersey

/s/ Harold A. Ackerman
U.S.D.J.